R. Walter **GRAHAM, Jr.,** Plaintiff-Appellant,

v.

**TEXAS GULF SULPHUR COMPANY** et al., Defendants-Appellees.

No. 71-1233.

United States Court of Appeals, Fifth Circuit.

Feb. 7, 1972.

As Amended on Rehearing March 2, 1972.

---

John M. McMullen, D. Marshall Simmons, Dallas, Tex., George C. Doub, Robert L. Brownell, Baltimore, Md., Jenkins Spradley & Gilchrist, Dallas, Tex., for R.

Walter Graham, Jr., appellant; Weinberg & Green, Baltimore, Md., of counsel.

Thomas M. Phillips, Houston, Tex., for Texas Gulf Sulphur Co.

Don L. Case, Jack Pew, Jr., Dallas, Tex., for Jos. E. Seagram; Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., of counsel.

Theodore F. Weiss, Jr., Houston, Tex., for appellees; Baker & Botts, Houston, Tex., of counsel.

Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.

COLEMAN, Circuit Judge:

This class action was brought by Walter Graham, Jr., as the owner of 50,200 Delhi Contract Units seeking judicial determination of past, present, and future rights of the holders of such units, as well as the corresponding obligations of Texas Gulf and Seagram with reference thereto. The suit included a prayer for general relief. The District Court denied all relief, including Graham's motion for a partial summary judgment, and granted a summary judgment for defendants-appellees.

This appeal involves an Everestian collection of facts, resting upon a labyrinth of sales, assignments, and reservations of interests, executed by multiple and diverse parties. The litigants agree, however, that there is no material issue of fact. They vigorously disagree as to the legal consequences.

Because we believe the District Court incorrectly interpreted the contracts in granting summary judgment for defendants-appellees, we reverse and remand the case to the District Court for entry of an order consistent with this opinion.

## I

### The Facts

The cornerstone of this litigation was a contract dated April 15, 1960, by which Delhi-Taylor Oil Corporation (hereinafter referred to as Delhi) ultimately sold valuable and extensive potash producing properties at Cane Creek, Utah, to Texas Gulf Sulphur Company (hereinafter referred to as Texas Gulf). By the terms of the sale, Texas Gulf agreed to construct, and did construct, mining facilities at the site, designed to produce and process a minimum of 4,000 tons of potash ore per day. In addition to a guaranteed scale of monthly payments, Delhi retained unto itself, its successors and assigns, a sliding percentage of not less than 15% nor more than 25% of any net profits realized by Texas Gulf from the potash and other minerals produced, marketed and sold from the properties involved. The scale was based upon the annual tonnage of potassium chloride marketed and sold by Texas Gulf.[1]

Paragraph 9 of the 1960 contract provided that Texas Gulf should maintain books of account and other records reflecting all operations of the potash properties, the mining facilities and the processing plant. It was further provided that the books should be audited at the close of each fiscal year by a firm of certified public accountants selected by Texas Gulf, "who shall furnish Delhi within a reasonable period of time after such audit, a copy of such audit report which shall contain an unqualified certificate of such accounts". Within one month after the close of each calendar month, Texas Gulf was required to furnish Delhi an unaudited statement of the net profits for that calendar month.[2]

1. | Annual Tons of Potassium Chloride Sold | Percentage of Net Profit |
|---|---|
| Less than 700,000 | 25% |
| 700,000 but less than 800,000 | 24 |
| 800,000 but less than 900,000 | 23 |
| 900,000 but less than 1,000,000 | 22 |
| 1,000,000 but less than 1,100,000 | 21 |
| 1,100,000 but less than 1,200,000 | 20 |
| 1,200,000 but less than 1,300,000 | 19 |
| 1,300,000 but less than 1,400,000 | 18 |
| 1,400,000 but less than 1,500,000 | 17 |
| 1,500,000 but less than 1,600,000 | 16 |
| 1,600,000 or over | 15 |

2. a. Texas Gulf shall cause books of account and other records to be maintained reflecting all operations of Said Properties and the mining facilities and proc-

The Delhi-Texas Gulf contract expressly provided that "In the event Delhi at any time assigns all of its remaining interests in Said Properties and this Agreement, such assignee shall be entitled to and receive such rights of inspection and audit".

This litigation, however, involves no controversy between Delhi [now liquidated] and Texas Gulf. The lawsuit springs from the subsequent contract by which Delhi assigned the 1960 contract to Joseph E. Seagram & Sons, Inc. (hereinafter referred to as Seagram), with a reservation of interests contemporaneously assigned to its stockholders as "Unit Holders". The Unit Holders are the plaintiffs, suing both Texas Gulf and Seagram.

Delhi had been engaged in the business of exploring for and producing oil and natural gas, primarily within the United States. After determining that it would be in the best interests of the Delhi stockholders to sell or otherwise dispose of the corporate assets the Board of Directors adopted a plan of liquidation directed toward that purpose. On August 26, 1964, the stockholders of Delhi approved that plan and all agreements incidental thereto.

The plan included the sale of Delhi's domestic oil and gas properties and its holdings in Canadian subsidiary corporations for the sum of $156,300,000. Additionally, Delhi's wholly owned subsidiary, Delhi Australian Petroleum Ltd., in partial repayment of open account advances issued a subordinated note to Delhi in the amount of $4,100,000. Delhi sold its common stock in Delhi Australian Petroleum Ltd. to that company. Delhi Australian Ltd. concurrently sold shares of its common stock to stockholders of Delhi.

Because of the immature and speculative nature of (1) certain unsold properties and of (2) the contractual interests *reserved* in connection with the various transactions, the Board of Directors decided that Delhi's stockholders would benefit from an arrangement by which they could participate in whatever future income the undisposed of assets might produce. To achieve this objective, the company sold these assets to Seagram, a subsidiary of Distillers Corporation-Seagrams Limited.

In addition to a payment of $550,000, Seagram agreed to manage and supervise the properties and reserved interests and to perform the duties and obligations

essing plant located thereon and/or used in connection therewith in accordance with this Agreement. Such books of account shall be audited as of the close of each fiscal year by a firm of independent Certified Public Accountants selected by Texas Gulf, who shall furnish Delhi, within a reasonable period of time after such audit, a copy of such audit report which shall contain an unqualified certificate of such independent accountants.

b. All books and records, of every kind and character, pertaining to Said Properties and the operations in connection therewith shall be maintained at the office of Texas Gulf in the area of the Cane Creek mining properties or such other place or places designated by Texas Gulf in writing to Delhi. Delhi shall have the right to examine such books and records, and supporting documents and records, at all reasonable times, including the right to have such examinations conducted by any reasonable number of representatives

and to have an audit by a firm of independent Certified Public Accountants selected by Delhi, all at the sole expense of Delhi. It is expressly provided, however, that the rights of inspection and audit herein granted to Delhi shall be a personal right of Delhi and no assignee of a portion of Delhi's interests in Said Properties and this Agreement shall have such rights of inspection and audit without the written consent of Texas Gulf. In the event Delhi at any time assigns all of its remaining interests in Said Properties and this Agreement, such assignee shall be entitled to and receive such rights of inspection and audit.

c. Within one month after the close of each calendar month Texas Gulf shall furnish to Delhi an unaudited statement of the net profits for such calendar month, and shall make payment to Delhi of the amount due, if any, which is in excess of any guaranteed advance net profits payments made to Delhi for such calendar month.

which Delhi had assumed under various contracts covering its original acquisition thereof. Seagram, of course, obligated itself to maintain various records with respect to these properties, with periodic reports to a *Disbursing Agent to be named by Delhi*, of which more is to be said *infra*.

The Texas Gulf Sulphur contract for the potash mines in Utah was among the assets assigned to Seagram. The agreement was that Delhi retained [for its Unit Holders] 90% of any payments thereafter received from Texas Gulf; Seagram was to receive 10%. Seagram was, by the terms of the contract, put under a specific duty to see that Texas Gulf paid, to the Disbursing Agent, the money it owed under the old Delhi-Texas Gulf contract.

> "Assignee [Seagram] will use its best efforts to cause Texas Gulf Sulphur Company . . . to pay directly to the Disbursing Agent . . . the proportionate share of such income reserved by Assignor [Delhi]. . . ."

Contemporaneously with the assignment to Seagram, Delhi executed another assignment by which it transferred to its stockholders all of the contract rights retained by it in the Seagram contract. This assignment was delivered by Delhi to the Republic National Bank of Dallas (hereinafter referred to as Republic) as Disbursing Agent for the stockholders.

As a condition to sharing in the pro rata distributions of the net proceeds acquired by Delhi from its liquidation each stockholder was required to surrender his stock certificates for cancellation. A stockholder surrendering his shares for redemption was entitled, *in addition to his share of the cash distribution*, to receive a certificate representing a number of contract units equal to the number of shares submitted for redemption. There are 6,278,371 contract units outstanding.

The assignment to the stockholders was accompanied by a Disbursing Agreement between Delhi and Republic, like-

wise executed October 1, 1964, by which Republic, as the Disbursing Agent for the Unit Holders, was to handle disbursements and transfers pertaining to the Contract Units in addition to making an annual distribution of all cash in its hands at the close of business on December 31 of each year.

The Delhi contract with *Seagram* required the following reports:

### "ARTICLE II.

"Covenants of Assignee

"2.5 Record Keeping and Reporting

\* \* \* \* \* \*

"(b) Assignee [Seagram] will furnish three copies of the following statements and reports to the person or entity [Disbursing Agent] designated:

"(1) *To the Disbursing Agent*, (emphasis added) within three months after the end of each fiscal year of Assignee a balance sheet of Assignee with respect to the Reserved Interests certified by the aforementioned firm of certified public accountants.

"(2) *To the Disbursing Agent*, (emphasis added) within three months after the end of each fiscal year of Assignee, a statement by the aforementioned firm of certified public accountants based on its audit of Assignee's books of account and other records as provided in 2.5(2) hereof of amounts due Assignor [Delhi] and authorized reimbursements paid Assignee by Disbursing Agent in connection with each item of the Reserved Interests for the preceding fiscal year.

"(3) *To the Disbursing Agent*, (emphasis added) on or before January 31st following the end of each calendar year a statement showing, to the extent of Assignee's knowledge, the amount of monies paid each month to the Disbursing Agent during the preceding calendar year under and pursuant to *each of the Reserved Interests, identifying the source and type of such monies* [emphasis by the Court] and the states in which any income was

produced if any of such states have an income tax or other tax based upon income."

As a part of what unmistakably was one integrated plan, Delhi, acting for its stockholders, who were soon to assume the new status of Unit Holders, then made the following agreement with Republic National, as Disbursing Agent:

"ARTICLE II

"Receipt and Disbursement of Funds

"2.4  Agent shall also on or before February 28 of each calendar year, or as soon as practicable thereafter, supply to the holders of record of the Certificates [Unit Holders] at the close of business on December 31 of the previous calendar year, written information as to the source and type of monies received by Agent for the benefit of such Certificate Holders, the fraction of income derived from each source, and the amount of such income produced in any State of the Union which levies income taxes, together with a certificate of a firm of independent certified public accountants expressing its opinion with respect to such written information and with respect to the deductions and charges made by Agent.  The obligation to supply such information is dependent upon receipt by Agent of such information from Seagram, as required by the Seagram Assignment, *and may be by amount or by fractions or percentages*.  (Again, emphasis added). * * *."

It must first be noted that the Delhi-Seagram assignment raised not the slightest hint that Texas Gulf, not a party thereto, was to be released from its original obligation dated April 15, 1960, to make full, complete, certified reports of its profits and losses.

It is not to be doubted that Texas Gulf owed the same reports to Seagram that it originally owed to Delhi.  Seagram as the owner of only 10% interest in the proceeds of that contract could no more waive the reports than it could

avoid its own contractual obligation to report to the disbursing agent.  Republic was obligated to report to the Unit Holders, although not with the detailed specificity imposed upon Texas Gulf and Seagram.

The *big fly in the ointment* was the Texas Gulf claim that after October 1, 1964, it had realized no net profits from the potash operations—hence no net profit payments either to Seagram or to the Disbursing Agent.

From October 1, 1964 to September, 1970, lacking one month of six years, Texas Gulf further muddied the waters by failing to give Seagram the annual reports required by paragraph 9 of its 1960 contract.  It merely submitted a statement by its accountants that it had no net profits from the potash operation.  These conclusory reports were supported by no figures.

There must have been some uneasiness about this.  Unknown to the disbursing agent and to the Unit Holders, on May 14, 1967, Texas Gulf and Seagram as the assignee of Delhi entered into an agreement by which Seagram agreed not to commence (or voluntarily become a party to) any court proceedings to determine the reporting obligations of Texas Gulf under the 1960 contract.  Evidencing further uneasiness, Texas Gulf agreed to indemnify Seagram and to hold it harmless from all liability, loss or damage that might be incurred by Seagram as a result of this agreement.

To this point we have considered a mass of facts, with no substantial legal issues.

II

*The Litigation*

In October, 1968, Graham filed his suit, seeking a declaration that Seagram is a trustee for the Unit Holders and as trustee *must provide the Unit Holders with certain* annual statements and reports "respecting its management and operation of the properties and contract rights assigned to it under the Delhi-

Seagram assignment as required by the terms of such assignment". The Court was specifically asked to order Texas Gulf to give Seagram the audits, reports, and unaudited monthly statements referred to in paragraph 9 of the Texas Gulf contract and to further direct Seagram to deliver these statements to Republic and to appellant's counsel.

The District Court ordered that the suit be maintained as a class action and that the members of the class should include *all holders* of Delhi Contract Units who did not request to be excluded from the class before January 31, 1969. The class as thus constituted included those who acquired the Units as Delhi stockholders and those who later purchased them on the open market. Of 11,508 holders of Delhi Contract Units only 200 requested exclusion.

In December, 1968, Texas Gulf offered, and all parties and the Court agreed, that Texas Gulf would deposit under seal, in the Registry of the Court, certified financial statements of Texas Gulf and its subsidiaries, including profit and loss statements for the fiscal years 1966 and 1967 with respect to the operations of the Cane Creek potash mining facilities. Appellant then made a motion which, had it been granted, would have allowed his attorney to examine these statements. After a hearing, the Court withheld decision pending further disposition of the case.

Texas Gulf then filed a motion for summary judgment, claiming that there was no genuine issue of fact and that defendants were entitled to judgment as a matter of law. Seagram moved for summary judgment, adopting and incorporating the motion of Texas Gulf.

The District Court denied these motions, but set the matter down for pretrial hearing. With no objection from any party, the Court ordered that the issues at the hearing would be:

"(1) Whether Joseph E. Seagram & Sons, Inc., under the applicable contracts is required to secure detailed accounting records from Texas Gulf Sulphur Company;

"(2) Whether plaintiff is entitled to receive the detailed accounting records referred to in (1); and

"(3) Whether plaintiff is entitled to recover any attorneys fees."

Immediately prior to the pre-trial hearing, Seagram and Texas Gulf filed a stipulation and agreement that the audited reports for 1966, 1967, and 1968 relating to the potash mining operations had been delivered to Seagram and that the 1969 report would be delivered in thirty days. Texas Gulf further agreed to deliver future reports as they came due. In return, Seagram agreed to keep the information confidential and subject to the orders of the Court. Seagram further agreed not to voluntarily divulge the contents of such audits and reports to anyone except its accountants. In agreeing to this Texas Gulf did no more than required of it in its assignment from Delhi and Seagram, without the authority of the Unit Holders (90% owners), agreed to a limitation not appearing in the contracts.

At the conclusion of the pre-trial hearing, the District Court denied appellant's motion for partial summary judgment, set aside the prior decision denying the motions for summary judgment on behalf of Texas Gulf and Seagram, and granted those motions, entering final judgment in their favor on the grounds that Seagram was not a trustee and that plaintiff and the represented class were not entitled to the reports sought by them. It is from this action that the appeal is brought.

### III

#### *The Decision*

The basic objective of this suit is to require Seagram to provide *the appellant and the class he represents* with the audited statements submitted by Texas Gulf concerning the potash operation, as described in the 1960 Texas Gulf-Delhi contract.

Appellant contended that Seagram was a fiduciary or trustee of the Reserved Interests which were retained for the benefit of Delhi Unit Holders. Appellant claimed that if Seagram is a trustee or fiduciary of the Reserved Interests, the District Court was required to direct Seagram to furnish the appellant and his class with a full, meaningful, and informative accounting of the trust property since 1964, and hereafter to do so annually.

The District Court met this argument by holding that Seagram was not a trustee. Counsel for appellant in this Court has filed a painstakingly thorough, brilliant brief, buttressed by a strong oral argument, in support of his belief that the holding below on this point was erroneous. Assuming that Seagram was a trustee, this fact alone would not entitle the Unit Holders to the information they desire. It is a principle of trust law that a settlor and a trustee may agree to limit the duties of the trustee to specific obligations. This agreement gains added force when the beneficiaries join in the agreement limiting the duties of the trustee. The instant case reveals such a situation. Delhi as "settlor", under a trust analysis, agreed with Seagram as "trustee" that Seagram would only be required to furnish certain enumerated reports *to the Disbursing Agent*. The stockholder (now Unit Holder) "beneficiaries", at an adjourned special meeting held on August 26, 1964, ratified this limitation of the "trustee's" duties. Assuming, but not deciding, that Seagram was a trustee, Seagram could be required only to fulfill the duties which it agreed to fulfill, making reports to the Disbursing Agent and not to the Unit Holders.

We believe, however, that the District Court erred in interpreting the duties of Seagram as to the reports to the Disbursing Agent. Two propositions are basic. First, the contracts are in reality one in that each contract incorporates the others by reference. Second, all contracts must be interpreted in the light of their expressed purposes. The contracts entered into on October 1, 1964, had two main objectives: (1) These contracts and the earlier Delhi-Texas Gulf contract sought to protect the secrecy of Texas Gulf's books and records; and (2) The contracts sought to protect the interest of the Unit Holders in the receipt of what was due them. To accomplish these objectives, the parties to this litigation devised a complicated scheme designed to keep Texas Gulf's secrets from public dissemination while, at the same time, protecting the Unit Holders from fraud or deceit.

As we read the contracts, the plan was designed to work as follows: Texas Gulf was required to give detailed reports to Delhi and allow Delhi to examine the books and records of Texas Gulf. This was particularly important because the amount of money which Delhi would receive was determined by the amount of production reflected in Texas Gulf's reports. (See Footnote 1). This plan was governed by the Delhi-Texas Gulf agreement in 1960. When this agreement was assigned to Seagram, Seagram received the right to the reports and the right to inspect. Seagram, of course, wanted this right in order to protect its right to receive 10% of the net profits. Delhi also wanted the interests of its Unit Holders protected as they were entitled to receive 90% of the net profits. Delhi knew, however, that complete disclosure of Texas Gulf's records to the Unit Holders would destroy the secrecy which was important to Texas Gulf.

The Disbursing Agent approach was devised to protect the Unit Holders while maintaining secrecy. Texas Gulf would have to fully disclose the pertinent information to Seagram under the old Delhi-Texas Gulf agreement, as assigned. This report would be independently audited. Then Seagram would *fully* disclose to Disbursing Agent. This report, too, would be independently audited. Finally, the Disbursing Agent would disclose, on a very limited basis, to the Unit

Holders. This report would also be independently audited. Thus, the Unit Holders would be protected by three full exposures of the information (Texas Gulf—Seagram—Disbursing Agent) and three independent audits; Texas Gulf's secrecy would be maintained because the reports would not reach the Unit Holders.

Several factors lead to this reading of the contracts. First, Seagram was put, by the express terms of the contract, under a duty to protect the interest of the Unit Holders. This duty is compatible with a requirement of full disclosure to the Disbursing Agent. Second, the Delhi-Seagram agreement, by its express terms, requires disclosure to the Disbursing Agent as follows: (1) disclosure of Seagram's balance sheet with respect to the Reserved Interests, (2) disclosure of the amounts due Delhi (now the Unit Holders) and Seagram from Texas Gulf, and (3) "the amount of monies paid each month to the Disbursing Agent during the preceding calendar year under and pursuant to each of the Reserved Interest, identifying the source and type of such monies. . . ." From these reports the Disbursing Agent must submit a limited report to the Unit Holders which, unlike the report from Seagram to the Disbursing Agent, "may be by amount or by fractions or percentages". Third, unless the Disbursing Agent received full disclosure from Seagram, the independent audit of the Disbursing Agent would be meaningless. Fourth, the two reporting dates (Seagram to the Disbursing Agent and the Disbursing Agent to the Unit Holders) are purposely arranged: "on or before January 31st following the end of each calendar year" for Seagram's report to the Disbursing Agent and "on or before February 28 of each calendar year" for the Disbursing Agent's report to the Unit Holders. Fifth, this interpretation preserves Texas Gulf's secrecy requirements because the confidential information goes no further than the Disbursing Agent. Yet the Unit Holders are protected because the information goes through three hands (Texas Gulf—Seagram—the Disbursing Agent) and three audits. Finally, it is inconceivable that the management of Delhi, while exhibiting an intention to provide for the welfare of the Unit Holders, would leave them at the mercy of Seagram by allowing Seagram to hold back the very information needed to insure honesty, and even waive their right to the information from Texas Gulf, as was once done.

The contract between Delhi and Seagram did not create a trust, as the plaintiffs contend, but rather a type of third-party beneficiary contract. When the contracts are read with their twin purposes in mind, the requirement of full disclosure from Seagram to the Disbursing Agent follows and serves the purposes of the contract. We reverse the decision of the District Court and remand the case to the District Court for entry of an order requiring Texas Gulf to disclose fully to Seagram (as they have stipulated to do) and requiring Seagram to disclose fully to the Disbursing Agent. The order will operate prospectively and retrospectively. That is, Texas Gulf must fully disclose to Seagram, as the Texas Gulf-Delhi agreement as assigned requires, all pertinent records since October 1, 1964. Seagram must disclose *fully* to the Disbursing Agent. All that Texas Gulf gives to Seagram, under the Texas Gulf-Delhi agreement as assigned, Seagram must disclose to the Disbursing Agent. Their past reports have not been adequate.

■ This brings us to other aspects of the case.

First, Graham was not a stockholder at the time of the Delhi liquidation. He purchased his Units on the open market. The Unit Certificate, as purchased by Graham, expressly contained the following proviso:

"The rights of the owner of this Certificate are subject to, and by accepting this Certificate the owner assumes the rights and obligations of a Certificate holder under all of the

terms and conditions of the said Contract of Assignment, said Disbursing Agreement and said Assignment of Interest, the terms and conditions of each of which said instruments are expressly incorporated herein by reference. Copies of these instruments are available for inspection by the record owner of this Certificate and the duly authorized representatives of said owner any time during normal business hours in the offices of the Trust Department of Bank, in Dallas, Texas."

Obviously, therefore, Graham agreed to a modification of the reportorial duties ordinarily required of a trustee, if there was one, and likewise agreed to the receipt of only such reports as the Delhi-Republic Disbursing Agent contract required Republic to make to the Unit Holders. Since the original Delhi stockholders agreed in advance to these restrictions they occupy the same status as Graham.

Appellant argues, however, that such restrictions are void as against public policy. The Delhi stockholders who approved this transaction, as drawn, knew that they were dealing with immature and speculative interests. They had sold the tangible assets for over a hundred and fifty million dollars. These retained interests represented the marginal odds and ends of a "clean up" operation. In the context of this case the interests might from the standpoint of present marketability be comparatively worthless. At least it was hoped that they might develop into something of real value. The obvious purpose was to hold on to any possibility of returns from assets of this kind. As to the Texas Gulf contract, the Delhi stockholders could not expect to receive any net profits from the potash operation before 1965. The liquidation was taking place in 1964. As a matter of fact, Texas Gulf claimed to the date of the hearing below that there had been no net profits at all. Delhi, by virtue of its contract with Seagram, at least had a plan which would protect some chance of future returns. There is no allegation of fraud, misrepresenta-

tion, or deceit. The suit was aimed at forcing Texas Gulf to file the reports it had obligated itself to file and then to see those reports. Delhi, however, had set up another plan and the stockholders had ratified it. Indeed, they had turned in their stock and had received cash and the Unit Certificates in return.

The essentially unusual facts cannot be fitted to previously decided cases but as an exercise of contract we see no impingement upon public policy in the efforts of a group to make the best of doubtful and speculative assets.

The first issue at the pre-trial hearing, upon which the Court ultimately entered a summary judgment without mentioning that issue, was whether Texas Gulf was required to report to Seagram as per its contract with Delhi. We assume this silence occurred because, while the litigation was in progress, Texas Gulf filed the reports with Seagram and agreed to continue to do so. Evidently, the Court considered the issue to have been mooted. We note, however, as already indicated that the agreement included the proviso that Seagram should keep the reports secret from all except its accountants. We enter the caveat that this secrecy is not to defeat the duty of Seagram to report to the Disbursing Agent.

We add a further thought. If the reports filed with Seagram and disclosed by Seagram to the Disbursing Agent reflect a loss by Texas Gulf there is no duty to reveal the extent of that loss to the Unit Holders since the contracts deal with the collection and distribution of income (net profits). Seagram must, in the case of a loss, still disclose fully to the Disbursing Agent, but only the fact of the loss, however, must be reported to the Unit Holders.

The denial of attorneys fees in the Court below has not been pursued on appeal.

On this appeal, appellant has failed in his contentions for the imposition of a trust. Appellees have failed in their efforts to support their summary

judgment. We therefore direct that each of the parties shall bear his appellate costs.

Reversed and remanded.